COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**


NO. 2-07-334-CV

IN THE INTEREST OF B.F.,
M.F., AND Z.F.

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

**Introduction**

Appellant Felicia C. appeals the trial court's order terminating her parental

rights to her three children, B.F., M.F., and Z.F.  In three issues, appellant

moves to strike the trial court's findings of fact and conclusions of law, argues

that sections 263.405(b) and (i) of the Texas Family Code are unconstitutional,

and contends that the evidence was factually insufficient to support the trial

---

[1] *See* TEX. R. APP. P. 47.4.

court's best interest findings.  Because we hold that the evidence was factually sufficient to support the trial court's best interest findings, we affirm.

## Background Facts

On October 20, 2006, the Texas Department of Family and Protective Services (TDFPS) received a referral that B.F. and M.F. were seen at school after hours using the bathroom and were unsupervised outside late at night. On October 31, TDFPS visited appellant's duplex on Austin Street, where she lived with her sister and their nine children.[2]  The duplex had one living room, one nonfunctioning bathroom, and two bedrooms.  TDFPS investigated, and appellant and her sister admitted to using methamphetamines.  TDFPS removed appellant's children, nine-year-old B.F., six-year-old M.F., and four-year-old Z.F. and placed them in foster care.[3]  Vickie Wright, a family-based safety services worker at TDFPS, testified at trial that TDFPS's concerns were appellant's drug use and neglectful supervision.

---

[2] Michael F., the children's father, did not live with appellant or the children.  At the time of trial, he was incarcerated.  Michael's parental rights to the children were terminated on September 13, 2007.  He did not appeal that order.

[3] Rather than place B.F., M.F., and Z.F. together in the same foster home, TDFPS placed them in homes with their closely-related cousins because they had all been living together prior to removal.

2

Tyra LaGarde, a caseworker for TDFPS, met with appellant in November 2006. Appellant admitted to LaGarde that she used methamphetamines while she was caregiver to her children. Appellant also told LaGarde that she had a problem and wanted to do what was needed to get her children back. LaGarde sent appellant for a drug assessment, and LaGarde prepared a service and treatment plan, which included parenting classes, a psychological evaluation, individual counseling, domestic violence counseling, and anger management; the service plan also required appellant to secure appropriate housing. A drug counselor recommended that appellant enter a two-year drug treatment program, but appellant refused. Appellant also refused to participate in a ninety-day drug treatment program but did agree to a thirty-day drug treatment program that included a housing program; appellant entered rehab in February 2007. Before entering the treatment program in February, appellant refused to participate in UAs requested by TDFPS in December 2006 and January 2007; appellant told LaGarde that the UAs would be dirty. After appellant completed the initial thirty-day program, TDFPS offered to let appellant stay in the housing program, but appellant refused because she wanted access to a telephone. Appellant attended five sessions of an after-care program, but she did not participate after April 2007. Appellant also attended five anger management

3

classes, but did not complete the program. Appellant did not attend any domestic violence classes or individual counseling.

Appellant continued to be randomly drug-tested once a month after leaving rehab. In March 2007, appellant's UA was negative, but an oral swab taken could not be used for testing because the sample of saliva was not large enough. In April 2007, appellant failed to take her drug test, thus TDFPS listed in its records that appellant had admitted to drug use.

Also in April, appellant moved to Wise County to live with her mother. While living in Wise County, appellant worked as a correctional officer for a company called Corrections Corporation of America (CCA), although she was unemployed at the time of trial. TDFPS also set up appellant's services in Wise County, including a psychological evaluation with Dr. Evan Knapp, a clinical psychologist.

In May 2007, Dr. Knapp conducted a psychological examination of appellant. According to Dr. Knapp, appellant had a past history of drug use; she smoked marijuana after her youngest child, Z.F., was born and started using methamphetamines when she moved in with her sister in 2006. Dr. Knapp also testified that appellant's parents smoked marijuana all of her life. Dr. Knapp testified that he believed appellant had a clear drug use problem although she did not have a long history of drug use. He also reported that

4

appellant had an adjustment disorder with mixed emotional features. Dr. Knapp stated that long-term support was very important for appellant to be a successful parent.

In May 2007, police arrested appellant for traffic violations, and she spent three days in jail. Also in May, appellant's hair follicle drug test was void because she had recently dyed her hair. Appellant's drug tests in June and July 2007 were negative; she did not submit to drug tests in August or September 2007, so TDFPS also recorded the skipped tests as admissions of drug use.

At some point in August, appellant moved back to Fort Worth and attended parenting classes. Appellant did not often attend visitations with her children after they were initially removed in October, but began to visit more frequently in the summer months. After appellant began her job training, the visits decreased again and remained sporadic at the time of trial. The children had a hard time not seeing appellant, and they were sad and cried when she did not attend. But the children were happy to see each other because they lived in separate foster homes. LaGarde testified that when appellant did visit, there was minimal interaction. Appellant would often sit on a chair or the couch and only communicate with the children when they approached her. CASA advocate Melissa Dailey, who was assigned to the case in November 2006, attended and observed most visits. She testified that appellant exhibited more

5

interaction with her youngest child, Z.F., and favored him more than the older two children. She also testified that interaction with the oldest child, B.F., was strained but improved over time. She also testified that appellant's interaction with M.F., her middle child, was minimal. Dailey noticed that appellant would not approach or hug M.F., and many times there was no interaction past the initial hello. Both LaGarde and Dailey often observed appellant making phone calls during her visits. LaGarde testified that during one visit, appellant called the children's father and had the children talk to him on the phone; B.F. became very upset after talking to her father.

When the children came into foster care, they were not in good physical condition. All of the children needed extensive dental work. For example, M.F. had numerous cavities, and Z.F. needed seventeen crowns. Additionally, the children's shots were not up to date. Z.F. was not in school because he did not have the required immunizations. TDFPS also had major concerns about Z.F.'s weight. When TDFPS removed Z.F., he was four years old but only weighed thirty pounds. Dailey also testified that Z.F. was very thin; his facial features were sunken, and his eyes were dark underneath.

The termination bench trial took place on September 11-13, 2007. At trial, Jeanette Mendez, M.F.'s teacher, testified that M.F. was in her class in

6

October 2006 for a total of twenty-eight days.[4]  She testified that M.F. was tardy eleven out of those twenty-eight days; he was also absent two days out of twenty-eight.  Mendez also testified that M.F. was very behind in his reading; for example, he should have been reading ninety words per minute, but he read only twenty-five or thirty.  M.F. also struggled with math and had trouble with simple addition and subtraction problems.  Mendez testified that each student kept a journal, but M.F. would only write one sentence in his book per day.  Additionally, M.F. returned his homework only three times.  Mendez knew that M.F. lived right across the street from the school, and she found out that M.F. was sneaking back into the school building after hours to use the restroom because the toilet in his house did not work.  Mendez also testified that M.F. did not always meet the dress code requirement and sometimes wore his sister's clothes, which were too big for him.  Mendez believed that M.F. was being neglected, but she did not know if there was any abuse going on.

B.F.'s foster parent, Janice F., also testified at trial.  Janice testified that B.F. had been living with her since February 2007.  She testified that B.F. was in fifth grade and doing well, although B.F. was "low" in math when she first came to live with Janice.  Janice also testified that B.F. told her that she had

---

[4] M.F. would have been seven years old.

seen appellant, her father Michael, and her aunt do drugs. B.F. told Janice that on visits, B.F. could smell drugs on appellant. B.F. also told Janice that she saw appellant and her father having sex and appellant having sex with other men.

Additionally, Janice testified about possible abuse to B.F. Janice said that she and B.F. were at home watching a documentary on TV about children being abused by family members when B.F. began to talk about sleeping in her father's bed. Janice stated that B.F. slept in her father's bed and one time she woke up and had slobber all over her nightgown; B.F. said that her father had slobbered on her, and she had to go change her nightgown. B.F. told Janice that the slobber smelled awful and was wet. Janice also testified that B.F. told her that she did not feel good "down [there]" when she woke up. B.F. also told Janice that appellant was not there. Janice could not get B.F. to talk about the incident anymore, but Janice did tell LaGarde and B.F.'s therapist. Janice testified that she believed B.F. was abused.

In addition to Janice's testimony about B.F.'s abuse, caseworker LaGarde also spoke with B.F. about the same incident. LaGarde testified that B.F. told her that she was in bed with her father and when she woke up, there was white, sticky spit all over her. LaGarde stated that B.F. told appellant, and appellant told her to stop sleeping with her father. LaGarde testified that B.F.

8

said that her father called appellant and her sluts and bitches and stated that B.F. was not his child.

LaGarde testified that at the time of trial, the children were current with their immunizations, doing great, and responded well to a more stable, structured environment. Five-year-old Z.F. was in kindergarten and loved school. He had gained weight and took a supplement to help with more weight gain although he remained tiny for his age. M.F. was an exceptional child with no need for special education and was over-the-top with academics. Although he had anxiety and worry over the foster care situation, he exhibited superior intelligence. M.F. took medications for ADHD, allergies, bed-wetting, and depression. B.F. also enjoyed school. Additionally, LaGarde testified that a home study was done on the children's maternal grandmother, but placement was denied by TDFPS because of unfavorable references. TDFPS determined that no other relatives were suitable placement options. LaGarde testified that she believed it was in the children's best interests to terminate appellant's parental rights to the children.

Appellant also testified at trial.[5]  Appellant stated that she did not know her current address because she had only lived there about one month but that her landlord's name was Rhonda.  Appellant also did not know about schools in the area, and she had not checked on teachers, schedules, or enrollment for her children.  Appellant testified that she had previously worked at a correctional facility for five months from the end of April until August, but she was not currently working because she had recently moved back to Fort Worth to find housing for her children.  Although she did not have a job at the time of trial, appellant testified that she had applied for employment at the post office, Smith Security, and Racetrac.

Appellant admitted that she began using drugs at age twenty-one[6] after her youngest child was born but did not know the effects that the drugs would have.  She testified that she would use drugs at night when the children were in bed.  Appellant testified that she was drug tested when asked and that there was only one time that she did not go, but she still went and was tested the next day.  Appellant also testified that she was not using drugs anymore.

---

[5] Appellant was present on the first day of trial, but she arrived almost two hours late on the second day of trial.  Appellant testified that she thought the trial started at 10:00 a.m.

[6] Appellant was twenty-seven years old at the time of trial.

Appellant stated that she took her children to the dentist, but that at times, she did not have transportation. She also took them to get their shots. Appellant did not talk to M.F.'s teacher and never received any notes from the school. She also testified that Mendez's testimony about M.F. being tardy eleven times was inaccurate; she said sometimes they were late but not eleven times. Transportation problems also prevented appellant from attending individual counseling, anger management, and domestic violence counseling; however, appellant got her car fixed the day before trial. Appellant stated that she was scared of taking the bus. Appellant testified that she did not know services were set up for her in Wise County while she was living there.

Appellant met the children's father, Michael, at a hotel once during the pendency of her case. She testified that he was both mentally and physically abusive. She also testified that she believed he was an appropriate person to parent their children.

Appellant testified that she missed some visits with her children while she was in rehab, but she did not recall missing any visits after that. She also missed some visits while she was training to be a correctional officer, but she tried to leave messages with LaGarde. Appellant also stated that she did not remember a time when she did not express affection or hug M.F.; her relationship with M.F. was not strained. She testified that she wanted her

11

children back because she loved them and they needed her; she was capable of parenting them, and she had a place for them to live. Appellant also stated that she would seek assistance if needed.

Rhonda E., who allowed appellant to stay with her for three days a week before trial, also testified. She testified that she met appellant four years ago at her sister's health club. Rhonda did not have much contact with appellant other than an occasional phone call but allowed appellant to stay with her because she knew appellant was trying to get her children back. Rhonda heard much of the testimony at trial and testified that she felt like appellant had lied to her, had no knowledge of all that was going on, was very naive about the situation, and was taken off-guard by the whole thing. Rhonda also testified that appellant never lived with her but only stayed with her for three days; after learning the circumstances of appellant's situation, Rhonda testified that there was no way appellant could live with her.

After the three-day bench trial, the trial court terminated appellant's parental rights to her children, finding by clear and convincing evidence that she (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical and emotional well-being, (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being, and that

12

(3) termination was in the children's best interests. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) & (2) (Vernon Supp. 2007). Appellant filed a motion for new trial, which contained her statement of points, and a notice of appeal. The trial court held a hearing on the motion for new trial on October 9, 2007. At that hearing, the trial court found appellant indigent and denied the motion for new trial.

**Statement of Points**

In appellant's second issue, which we will address first, she argues that sections 263.405(b) and (i) of the family code place the first level of appeal in the trial court, which has no appellate jurisdiction, thus preventing this court from addressing issues preserved or otherwise raised on appeal. Additionally, appellant argues that those provisions violate due process and the separation of powers doctrine.

Because this court has held that section 263.405(i) is "void as a violation of the separation of powers provision of the Texas constitution," we sustain appellant's first issue to the extent she argues section 263.405(i) violates the separation of powers provision of the Texas constitution. *In re D.W.,* No. 02-06-00191-CV, 2008 WL 467328, at *12 (Tex. App.—Fort Worth Feb. 19, 2008, no pet. h.) (en banc).

13

**Findings of Fact and Conclusions of Law**

In her first issue, appellant moves to strike the trial court's findings of fact and conclusions of law. Appellant contends that although neither party requested any findings of fact or conclusions of law, the trial court signed a document entitled "Findings of Fact and Conclusions of Law as Requested by Respondent Felicia C[.]" on October 9, 2007. Appellant's statement of points was due on September 28, 2007, fifteen days after the termination decree was signed; therefore she did not include any attack on the findings of fact or conclusions of law. Appellant questions whether she has waived her factual sufficiency complaint because she was not able to challenge the individual findings of fact and conclusions of law in her statement of points.

The State does not contest appellant's contention and concedes that the evidentiary findings entered by the trial court are immaterial. Additionally, appellant did generally raise her factual sufficiency challenge to the trial court's best interest finding in her combined motion for new trial and statement of points. Furthermore, we have already determined that section 263.405(i) of the Texas Family Code violates the separation of powers provision of the Texas constitution. *D.W.,* 2008 WL 467328, at *12. Thus, we sustain appellant's first issue and address the merits of her remaining issue.

14

## Factual Sufficiency Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. TEX. FAM. CODE ANN. § 161.206(b) (Vernon Supp. 2007); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20-21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp. 2007); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the

child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (Vernon 2002).

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that termination of the parent's parental rights would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable fact-finder

could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(1)     the desires of the child;

(2)     the emotional and physical needs of the child now and in the future;

(3)     the emotional and physical danger to the child now and in the future;

(4)     the parental abilities of the individuals seeking custody;

(5)     the programs available to assist these individuals to promote the best interest of the child;

(6)     the plans for the child by these individuals or by the agency seeking custody;

(7)     the stability of the home or proposed placement;

(8)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

17

(9)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

In addition to the above, a parent's inability to provide adequate care for the children, lack of parenting skills, and poor judgment may also be considered when looking at the children's best interest. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). Evidence of a parent's unstable lifestyle can also support a factfinder's conclusion that termination is in the children's best interests. *In re S.B.,* 207 S.W.3d 877, 887 (Tex. App.—Fort Worth 2006, no pet.). Furthermore, a parent's drug use and inability to comply with his or her family service plan support a finding that termination is in the children's best interests. *Id.* at 887-88.

**Desires of the children**

Caseworker LaGarde testified that when the children were initially placed in foster care and realized that most people did not live the way they had been living, they were sad. The children expressed a desire to return to living with appellant if conditions were better.

Janice F., B.F.'s foster parent, testified that B.F. loved appellant and prayed for her. Janice also testified that B.F. wanted to be with appellant but not if appellant continued to do drugs and go out often. B.F. did not want to be the mother to her younger brothers.

LaGarde testified that the transition into adoption may be hard on the children at first, but they were ready to move on. She testified that they wanted closure and were ready to go to the next phase of their lives. She also stated that their relationship with appellant was strained and there was minimal interaction between appellant and the children. CASA advocate Dailey also testified that moving the children to a new home would initially be challenging because they would no longer be with their cousins and because they loved appellant, but it was critical that the children be together. She testified that the sibling relationship should take priority over the relationship with their cousins.

**The emotional and physical needs of the children now and in the future, and the emotional and physical danger to the children now and in the future**

Family-based safety service worker Wright testified that appellant's duplex was clean, the kitchen worked, and there was food in the house. But a court report by CASA advocate Dailey stated that the house contained no food. The record contains evidence that M.F. and Z.F. were too thin, they went to school hungry, and often asked neighbors for food. Dailey's testimony illustrates the lack of a proper diet; she stated that Z.F.'s facial features were sunken, and his eyes were dark underneath. Additionally, the bathroom did not work, and B.F. and M.F. were sneaking into their school across the street after hours to use the restroom. The record reflects that the children had extensive dental problems that required numerous caps, crowns, and fillings. In addition, the children's shots were not up to date. Although she sometimes had transportation problems, appellant testified that she took her children to the dentist and that the children's shots were current.

The evidence also shows that appellant has had frequent changes of residences and multiple jobs. Since the children were placed in foster care in October 2006, appellant had lived in at least five locations: with a friend Rhonda, with a cousin named Amber, with her mother in Wise County, at a thirty-day drug treatment facility, and in a house off of Austin Street. Before

20

living on Austin Street, appellant lived in two homes for battered women. Appellant testified that she had four jobs since she lived in the home for battered women, but the evidence shows that appellant's only job was for five months as a correctional officer. Appellant was not employed when the children were removed nor was she employed at the time of trial. Further, it was not clear at trial where appellant was living. Appellant testified that she was living with her friend Rhonda; however, Rhonda testified that she let appellant stay with her for three days about a week before trial, but appellant was not currently living with her nor could appellant live with her.

The evidence also shows that the children struggled in school. However, since their removal, the children had done great and responded well to a more stable, structured environment. Z.F. was in kindergarten, loved school, and gained weight. M.F. was an exceptional child with no need for special education, over-the-top with academics, and exhibited superior intelligence. Although he had anxiety and worry over the foster care situation, M.F. took medications for ADHD, allergies, bed-wetting, and depression. B.F. also enjoyed school and was doing well.

21

**The parental abilities of the individuals seeking custody, and the programs available to assist these individuals to promote the best interest of the children**

Appellant admitted that she began using drugs at age twenty-one after her youngest child was born. Although appellant testified that she did drugs at night when her children were in bed, the evidence demonstrates that her children were aware of her drug use. For example, B.F. told Janice that she saw appellant doing drugs and that she could smell drugs on appellant during visitations. Additionally, M.F. was seen simulating injecting something into his arm.

After appellant completed the thirty-day drug treatment program, TDFPS required her to be drug tested once a month. Appellant testified at trial that she was not using drugs anymore, but she had three positive test results and six admissions from December 2006 until September 2007. During this same time period, appellant tested negative for drugs only three times.

The evidence demonstrates that appellant completed a psychological evaluation and parenting classes as required by her service plan. Appellant also participated in other programs and services, such as the after-care program and anger management; however, appellant testified that she did not complete those programs because she started working. Additionally, appellant did not participate in any individual counseling or domestic violence counseling.

22

Although housing was an issue in this case, appellant refused to stay in the housing program following the completion of her thirty-day treatment program.

Dr. Knapp conducted a psychological evaluation of appellant in May 2007. Dr. Knapp testified that appellant did not have a positive relationship with the children's father, Michael, and that he was verbally abusive. Despite appellant admitting that Michael was both mentally and physically abusive, she met him at a hotel once while the case was pending and testified that she believed he was an appropriate person to parent their children. There is also evidence that appellant was aware that Michael was sexually abusing B.F., but she took no action to protect her daughter. When B.F. told appellant about what had happened, appellant told B.F. to stop sleeping with her father.

Dr. Knapp also observed that appellant had low confidence, did not feel good about her abilities or about herself, and had low self-esteem. He testified that although appellant had dropped out of high school, she later went back to get her GED. He also stated that appellant had an average IQ with a high school reading level and seventh grade math skills.

The record also reflects that appellant made some effort to attend visitations with her children. Appellant missed most visits during the first two months after the children were removed and before she entered rehab, but she did make most of the visits after rehab until she started training for her job as

23

a correctional officer. The record also reflects that many of those visits were strained, and she had minimal interaction with the children. Additionally, appellant often made phone calls during visitation hours.

The evidence reflects that TDFPS made efforts to work with appellant. For example, TDFPS set up services for appellant when she moved to Wise County and tried to coordinate visits to accommodate appellant's schedule. But appellant was unable to complete most of her service requirements or remain drug free. Furthermore, she continued to interact with the children's abusive father rather than develop a relationship with her children.

**The plans for the children by these individuals or by the agency seeking custody, and the stability of the home or proposed placement**

Regarding future plans for the children, both LaGarde and Dailey testified that TDFPS's goal was to have the children adopted together. At the time of trial, the children were living apart in foster homes, but Dailey testified that keeping the children together was critical. LaGarde testified that a home study was done on the children's maternal grandmother, but TDFPS denied placement because of unfavorable references.

Appellant testified that she was trying to obtain housing for her herself and her children, but at the time of trial, appellant was unemployed and homeless.

**The acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of appellant**

As for the parent-child relationship, there is evidence that B.F. took on the role of mother to her younger brothers. For example, appellant would sleep all day, and B.F. would wake her to make sure M.F. was picked up from school. In addition, the children were sad when they realized that the life they had been living with appellant was not normal. Furthermore, appellant did not seem to be as bonded to the children as they were to her.

The evidence also establishes that appellant was a chronic drug user and that she never provided money, clothing, or gifts to her children while they were in foster care.

Based upon our review of the entire record, including appellant's history of drug abuse and inability to maintain a stable lifestyle with steady employment and adequate housing, we conclude that the trial court could have reasonably formed a firm conviction or belief that termination of appellant's parental rights was in the children's best interest. *See S.B.,* 207 S.W.3d at 887-88. Therefore, we hold that the totality of the circumstances in light of the *Holley* factors is factually sufficient to establish by clear and convincing evidence that termination was in B.F.'s, M.F.'s, and Z.F.'s best interest. *Id.* Accordingly, we overrule appellant's third issue.

25

**Conclusion**

Having overruled appellant's third and only dispositive issue, we affirm the trial court's judgment.

TERRIE LIVINGSTON
JUSTICE

PANEL F:    CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

CAYCE, C.J. concurs without opinion.

DELIVERED: April 3, 2008